**CONAGRA, INC. Plaintiff,**

v.

**ARKWRIGHT MUTUAL INSURANCE CO. and The Hobbs Group, Inc., Defendants.**

No. 95 C 3738.

United States District Court, N.D. Illinois, Eastern Division.

Sept. 10, 1999.

Gerald G. Saltarelli, Michael A. Stick, Butler, Rubin, Saltarelli & Boyd, Chicago, IL, Pamela K Black, McGrath, North, Mullin & Kratz, Omaha, NE, John E. North, Jr., McGrath, North Mullin & Kratz, Omaha, NE, Peter G. Land, Babbitt & Melton, Chicago, IL, for Conagra Inc, plaintiff.

Patricia Peter, John C. Goodnow, Mark J. Feinberg, Dale I Larson, Terese S Wallschlaeger, Kathryn M. Walker, Zelle, Hofmann, Voelbel & Gette, LLP, Minneapolis, MN, Jeffrey Eric Margulis, Kaplan, Begy & von Ohlen, Chicago, IL, Jeffrey Mark Rubin, Neal Jeffrey Moglin, Lovell, White & Durrant, Chicago, IL, for Arkwright Mutual Insurance Co., defendant.

David M Agnew, Lord, Bissell & Brook, Chicago, IL, for Hobbs Group, Inc., The defendant.

### MEMORANDUM OPINION AND ORDER

MAROVICH, District Judge.

After its initial complaint in Massachusetts state court was stayed on grounds of *forum non conveniens, see Conagra, Inc. v. Arkwright Mut. Ins. Co.,* 1995 WL 808941 (Mass.Super. March 14, 1995), in June 1995, Conagra, Inc. ("Conagra") filed an action in this Court against Arkwright Mutual Insurance Co. ("Arkwright"), its former insurer, and The Hobbs Group, Inc. ("Hobbs"), its purported insurance broker, seeking over $28 million pursuant to various claims regarding its insurance coverage for two warehouse fires. Since then, the parties have battled regarding, among other things, procedure, *see Conagra v. Arkwright Mut. Ins. Co.,* 1997 WL 573401 (N.D.Ill. Sept.11, 1997), and discovery, *see ConAgra v. Arkwright Mut. Ins. Co.,* 32 F.Supp.2d 1015 (N.D.Ill.1999). It is finally ripe to address some of the merits of the parties' contentious dispute.

Presently, the parties have submitted five separate motions for summary judgment: (1) Conagra's motion for summary judgment against Arkwright, (2) Conagra's motion for summary judgment against Hobbs, (3) Arkwright's motion for partial summary judgment against Conagra, (4) Hobbs' motion for summary judgment, and (5) Hobbs' motion for partial summary judgment to reduce damages. Having considered the hundreds of pages of briefs and factual submissions, as well as the relevant portions of the 14 volumes of exhibits, the Court: (1) denies Conagra's motions for summary judgment against Arkwright and Hobbs, (2) grants Arkwright's motion for partial summary judgment against Conagra, (3) grants in part and denies in part Hobbs' motion for summary judgment against Conagra, and (4) denies Hobbs' motion for partial summary judgment to reduce damages.

## BACKGROUND

The following facts are undisputed unless otherwise noted. Conagra and its wholly owned subsidiaries and divisions (the independent operation companies, or "IOCs") are engaged in the production and distribution of a wide range of food and food related products throughout the United States and internationally. Arkwright is authorized to conduct business in Illinois as an insurer of various risks including damages to property. Hobbs, at all times relevant in this case, was an insurance broker engaged in the business of selling insurance and providing related services to its customers. Arkwright was the parent company of Hobbs.

Prior to June 1, 1989, Conagra and its IOCs were insured by a group of London underwriters. In early 1989, Arkwright had initial discussions with representatives of Conagra concerning the possibility of Arkwright providing property insurance for Conagra. These initial discussions culminated on April 21, 1989, when Arkwright presented its initial proposal for property coverages commencing June 1, 1989 and continuing for five years. On August 28, 1989, Arkwright issued a written policy of insurance (the "Arkwright Policy") to Conagra, and the Arkwright Policy was modified December 31, 1989 to add certain additional coverages. In June of 1991, Conagra's property insurance program was modified again as a joint property insurance program was instituted between Arkwright and certain London insurers.

On December 28, 1991, Conagra sustained fire damage to its property at the Americold Facility in Kansas City, Kansas. On March 16, 1992, Conagra sustained fire damages to its property at the Marshall Facility in Marshall, Missouri. The Marshall Facility was a non-owned outside warehouse used for temporary storage and consolidation of Conagra's products after they had left Conagra manufacturing facilities and while they were in the process of being distributed to Conagra's ultimate customers. The Americold Facility was also a non-owned outside warehouse used for temporary storage of product awaiting delivery to the Marshall Facility. None of the products in the Americold Facility or the Marshall Facility had reached their final destination at the time of the fires.

Conagra subsequently submitted claims for coverage for losses associated with the two fires. At that point, as one of the parties has stated in a colossal understatement, "certain issues arose between the parties which were not resolved." (Ark. Mot. at 2.) Indeed, in January of 1993, Conagra initiated action in Massachusetts state court against Arkwright. That action was stayed under the doctrine of *forum non conveniens* on May 4, 1995. Conagra subsequently refiled this action in this Court on June 6, 1995 and, on October 2, 1997, filed its Second Amended Complaint against Arkwright and Hobbs. Presently, as noted above, each party has filed at least one motion seeking summary judgment in this proceeding.

## DISCUSSION

I. *Summary Judgment Standards*

Summary judgment is proper if there is no genuine issue as to any material fact

and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). The moving party has the initial burden of submitting affidavits and other evidentiary material to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Only genuine disputes over "material facts" can prevent a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

To overcome a motion for summary judgment, the opposing party cannot rest on the pleadings but must, by affidavit or other means, set forth specific facts showing that there is a genuine issue of fact. *See* Fed.R.Civ.P. 56(e). While the record "and all reasonable inferences drawn from it [are to be viewed] in the light most favorable to the party opposing the motion," *Bisciglia v. Kenosha Unified Sch. Dist. No. 1,* 45 F.3d 223, 226 (7th Cir.1995), the nonmovant must show more than "some metaphysical doubt" regarding the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## II. *Conagra v. Arkwright*

Conagra's Second Amended Complaint asserts six claims against Arkwright: (1) breach of contract (Count I), (2) estoppel (Count II), (3) unfair practices (Count III), (4) improper claims practice (Count IV), (5) breach of fiduciary duty (Count V), (6) negligent misrepresentation (Count VI), and (6) breach of contract (Count IX).[1] Conagra presently moves for summary judgment with respect to the breach of contract (Count I) and estoppel (Count II) claims. Arkwright presently moves for summary judgment with respect to the

unfair practices claim (Count III) and breach of contract claim (Count IX).

### A. Breach of Contract (Count I)

Conagra asserts that Arkwright has breached its insurance contract. Under Illinois law,[2] a court's primary duty in construing the language of an insurance policy is to ascertain and give effect to the intentions of the parties as expressed within the policy. *See Outboard Marine Corp. v. Liberty Mut. Ins. Co.,* 154 Ill.2d 90, 107–08, 180 Ill.Dec. 691, 607 N.E.2d 1204, 1212 (1992). As the Seventh Circuit has stated:

[i]n construing an insurance policy, the court must ascertain the intent of the parties to the contract by construing the policy as a whole while giving due regard to the risk undertaken, the subject matter that is insured, and the purposes of the entire contract. When the words of the policy are unambiguous, they are afforded their plain, ordinary and popular meaning. If the words are susceptible to more than one interpretation, however, they are ambiguous and are to be construed in favor of the insured and against the insurer.

*Employers Ins. of Wausau v. James McHugh Const. Co.,* 144 F.3d 1097, 1104 (7th Cir.1998) (citing *Outboard Marine Corp.,* 154 Ill.2d at 107–08, 180 Ill.Dec. 691, 607 N.E.2d at 1212).

Here, Conagra asserts that Arkwright has breached the insurance contract because coverage exists for the Americold Loss and the Marshall Loss. Specifically, Conagra contends that coverage exists in the Arkwright policy under: (1) its property coverage and (2) an Ocean Cargo Endorsement. The Court will consider these arguments in turn.

---

**1.** Conagra's Second Amended Complaint asserts two counts against Arkwright titled "breach of contract." The breach of contract claim contained in Count I pertains to allegations that Arkwright breached its insurance contract with Conagra concerning the warehouse fires at issue. The breach of contract

claim contained in Count IX pertains to allegations that Arkwright failed to pass on certain "reinsurance savings" to Conagra in 1991.

**2.** The parties agree that Illinois law applies to this claim.

### 1. Property Coverage

Conagra argues that the Americold and Marshall losses were covered under property insurance coverage with Arkwright. The Arkwright Policy property coverages were "All Risk" and insured Conagra and all of its affiliates. (Joint App., Ex. 175 at A309407.) The property coverages further applied "only at locations described in the Schedule(s) attached to and forming a part of [the] Policy." (*Id.* at A309543.)

Arkwright first provided coverage for Conagra's property locations within the United States in 1989. In June of 1991, Arkwright and certain London insurers split up the responsibility for covering Conagra's property locations on the basis of the properties' reported total insured value. At that time, those with reported total insured values of under $10 million would be covered by London insurers. Those with reported total insured value of over $10 million would be covered by Arkwright.

The Arkwright Policy additionally contained an Errors and Omissions clause. That policy provision provided as follows:

In the event of loss or damage of the Insured located in the United States, Puerto Rico and Canada, and such loss is not payable under this Policy solely because of:

(a) any error or unintentional omission in the description or location of property insured under this Policy, which error or omission existed at the inception date of this Policy; or

(b) any error or unintentional omission in the description or location of property insured under this Policy, in any subsequent amendments to this Policy; or

(c) failure through error or unintentional omission to include (1) any location owned or occupied by the Insured at the inception date of this Policy, or (2) any location newly acquired or occupied during the term of this Policy; or

(d) any error or unintentional omission which results in cancellation of property insurance under this Policy, such loss or damage shall be insured by this policy only to the extent this Policy would have provided coverage had the error or unintentional omission not been made, up to a limit of $*.

(Joint App., Ex. 176 at A310378.)

The Americold and Marshall losses occurred after the Arkwright/London joint program for Conagra's property insurance coverage was implemented in June of 1991. Under the property coverages provided by Arkwright (the locations with total insured values above $10 million), Schedule 90 was used to identify outside warehouses. At the time of the losses in question, neither the Marshall Facility nor the Americold Facility were described in Schedule 90. Notwithstanding that fact, Conagra contends that Arkwright's insurance covered the Americold and Marshall losses because, on June 1, 1991, both warehouses were locations with property in excess of $10 million. Conagra further asserts that to the extent that the Americold Facility and the Marshall Facility were not properly scheduled under the property coverage in the policy, the Errors and Omissions Clause provides coverage for those losses. The Court will separately consider whether coverage existed for the Marshall and Americold losses pursuant to the terms of the Arkwright Policy's property coverage provisions.

#### a. The Marshall Facility

The Marshall Facility was originally scheduled on an initial version of Schedule 90 issued May 17, 1990 and made effective December 31, 1989. However, a later version of Schedule 90, issued August 26, 1991 and made effective May 31, 1991, stated with respect to Marshall Facility: "Location Canceled May 31, 1991." Conagra asserts that the Marshall Facility had, on June 1, 1991 and at the time of the fire at the facility, more than $10 million in total insured value. Conagra claims that

its deletion from Schedule 90 was error and that coverage is available under the Errors and Omissions clause.[3]

The essential dispute between the parties with respect to whether the Errors and Omissions clause covers the loss at the Marshall Facility is how and when the property values needed to be computed under the policy. Arkwright claims that, although the policy did not explicitly require it, "common sense" dictates that Conagra needed to report updated values for its property locations. (Arkwright Resp. at 14.) Arkwright contends that Conagra's failure to do so with respect to the Marshall Facility was its own fault. On the other hand, Conagra claims that updating the property values was Arkwright's responsibility. Conagra claims that Arkwright used outdated information for the Marshall Facility and, therefore, erroneously omitted the facility from Schedule 90.

The Arkwright Policy does not directly address whose responsibility it was to update Conagra's property values and how and when such values would be computed. Arkwright notes that a provision in the policy titled "Special Review of Values" stated that "[t]he Insured shall send to this Company maximum and average insurable values for each of the locations where allocated values are shown in the schedule page(s)." (Joint App., Ex. 219 at A309571.) On the other hand, Conagra has presented evidence that another clause in the Arkwright policy effective June 1, 1991 provided as follows: "Notice is accepted that in respect in locations where total values at inception or subsequent anniversary exceed $10,000,000 the Arkwright Mutual Insurance Company is insuring the same interest(s) as covered hereunder[.]" (*Id.*, Ex. 177 at A309578.) Moreover, the coverage conditions of the Errors and Omissions clause provided "Automatic Coverage and Errors & Omissions Coverage under this policy apply only where the combined Total Insured Value (Property Damage and Time Element) of the location exceeds $10,000,000." (*Id.*) In light of the conflicting provisions, the Court finds that the issue regarding whose responsibility it was to update Conagra's property values and how and when such values would be computed is ambiguous under the terms of the Arkwright Policy.

The extrinsic evidence merely reinforces this ambiguity. Conagra has presented evidence that the allocation of responsibility for Conagra's property between the London insurers and Arkwright was properly made on the basis of "total insured values" at the inception of the program. (*See* Joint App., Ex. 20 at 70:19–72:2.) Conagra has additionally presented evidence that it was Arkwright's responsibility to collect information concerning property values and prepare schedules which allocated responsibility for Conagra's property locations between Arkwright and the London Underwriters. (*Id.*, Ex. 24 at 186:2–11, 187:16–188:7.)

On the other hand, Arkwright has presented evidence that the split of locations was to be based on total insured values *reported* at inception. (*See id.*, Ex. 75; Ex. 11 at 48:18–49:6.) Arkwright has further presented evidence that it was Conagra's responsibility to provide Arkwright with updated values to use in the schedules which would form the basis for allocating responsibility between Arkwright and London. (*Id.*, Ex. 24 at 214:1–215:6; 270:6–11; 330:20–331:8.) Finally, Arkwright has provided evidence that it requested that Conagra provide updated values for the outside warehouses prior to the June 1, 1991 split in insurance coverage but that Conagra did not provide such information. (*See, e.g., id.*, Ex. 72; Ex. 73; Ex. 186.)

---

**3.** The Arkwright Policy contained a special Missouri Endorsement which precluded cancellation, reduction or adverse modification of property insurance for property which, like Marshall, is located in Missouri without 30 days written notice and tendering the un-earned premium. (*See* Joint App., Ex. 175 at A310449.) Conagra claims that because it did not receive 30 day notice of any cancellation, any cancellation of the Marshall Facility by Arkwright was ineffective.

The Errors and Omissions clause, which Conagra seeks coverage under, provides coverage for "any error or unintentional omission in the description or location of property insured under th[e] Policy, which error or omission existed at the inception date of th[e] Policy." Arkwright has presented evidence here that its property coverage policy provisions only covered property locations with reported property values over $10 million. Arkwright has additionally presented evidence that Conagra did not report such values regarding the Marshall Facility. If Arkwright is right, an inference could be drawn that Conagra consciously failed to comply with the provisions of the Arkwright Policy such that no "error or unintentional omission" occurred triggering the Errors and Omissions clause. Because of the above described issues of material fact, the Court denies summary judgment with respect to Conagra's claim that it is entitled to property coverage for its Marshall Facility loss.

b. The Americold Facility

■ The Americold Facility had a large amount of inventory at the time of the fire. Specifically, the Americold Facility had inventory of Armour Food Company and Swift–Eckrich, Inc. (the "ASE Inventory") and additional inventory (the "CFF Inventory"). Arkwright has compensated Conagra for the loss sustained for the ASE Inventory. Conagra, however, seeks recovery of additional unreimbursed losses as a result of the destruction of the CFF Inventory. (Joint App., Ex. 1 ¶ 40.)[4]

Unlike the Marshall Facility, the Americold Facility was actually included as a scheduled location under the Arkwright Policy as of the date of the Americold Loss. Conagra contends, however, that it was described on the wrong schedule, Schedule 40 instead of Schedule 90. Schedule 40, which was issued August 26,

1991 and made effective May 31, 1991, described the Americold Facility as "Lanter Distribution Warehouse" with an address of 6508 Indianapolis Drive, Kansas City, Kansas and an insured value of $19.4 million. (*See* Joint App., Ex. 175 at A310332.)

In a letter dated January 3, 1991,[5] an Arkwright account services representative wrote the following letter to Conagra:

> Swift Eckrich reported (at 5/31/91) at 6508 Indiana Drive, Kansas City, KS with property values of $19,389,000. This was shown as a Swift location operating under the name Lanter Dist. On 9/5/91 this location was included on the list of locations which were being moved to the outside warehouse portion of the property program (copy attached).
>
> On 9/30/91 FM conducted an inspection and included in their comments section (copy attached) that Swift did not have any storage at this facility. It identified the proper location for storage as 6500 Inland Drive (the infamous Americold Storage Facility).
>
> It would appear that our policy is incorrect and that we need to cancel the location at 6508 Indiana Drive from Swift and add the location at 6500 Inland Drive to the Outside Warehouse Schedule.
>
> Prior to doing this we need to verify if Swift has any exposure at the Lanter facility at 6508 Indiana Drive. Please confirm that we should cancel 6508 Indiana Drive and add 6500 Inland Drive effective 5/31/91.

(Joint App., Ex. 80.)

Conagra claims that this letter demonstrates that Arkwright discovered during the course of an inspection that the correct address for the Americold Facility was 6500 Inland Drive, Kansas City, Kansas and that it was an outside warehouse.

---

4. Americold, through one of its insurers, settled Conagra's claim relating to the CFF Inventory with a payment to Conagra of $8,052,727.98. (Joint App., Ex. 2 ¶ 30.)

5. This letter was apparently misdated as being written on January 3, *1991*, but was actually written on January 3, *1992*.

The Arkwright Policy, however, was not amended to add the Americold Facility to the property coverage schedule. Nevertheless, Conagra asserts that the Americold Facility was a "location" identified in the Arkwright Policy with over $10 million in insured values such that it was covered by the Arkwright Policy's property coverage provisions.

Arkwright does not deny that the total inventory contained at the Americold Facility had an insured value above $10 million. Arkwright asserts that it therefore agreed to pay for the ASE Inventory loss at Americold because it had discovered the mistaken address of the ASE goods before the loss. Arkwright contends, however, that the CFF Inventory loss presents a different situation because it was insured by London by virtue of its inclusion in the May 29, 1991 official schedule within the "Miscellaneous Warehouses" designation. (Arkwright Resp. at 17.) In other words, Arkwright contends that the inventory at Americold was separated between the ASE inventory (which was covered by Conagra because it had an insured value above $10 million) and the CFF Inventory (which was covered by London because it had an insured value below $10 million).

The Court finds Arkwright's argument and supporting evidence conflicts with the clear language of the Arkwright Policy. The Arkwright Policy clearly covered "locations" where "total insured value" exceeded $10 million as of June 1, 1991. It is undisputed that the Americold Facility contained inventory having a total insured value in excess of $10 million as of June 1, 1991. Arkwright's argument that the Americold Facility was more than one "location" because more than one of Conagra's IOC maintained inventory finds no support in the terms the Arkwright Policy. As such, all of the Americold Facility inventory loss was covered under the Arkwright Policy.

■ There is an additional matter, however, which makes summary judgment in Conagra's favor inappropriate. As discussed earlier with respect to the Marshall loss, there is an issue of fact as to whose responsibility it was to update Conagra's property values and how and when such values would be computed. Again, a provision in the policy titled "Special Review of Values" stated that "[t]he Insured shall send to this Company maximum and average insurable values for each of the locations where allocated values are shown in the schedule page(s)." (Joint App., Ex. 219 at A309571.) Arkwright asserts that, even if the Arkwright Policy covered all of the inventory at the Americold Facility, the "Special Review of Values" provision of the Arkwright Policy limits Conagra's right to recover for the Americold loss.

In sum, the Court finds that the clear and unambiguous language of the Arkwright Policy provides coverage for the inventory loss at Americold. In determining the exact amount of damages, however, an issue of fact exists as to the applicability of the Special Review of Values provision contained in the Arkwright Policy, precluding summary judgment on behalf of Conagra.

### 2. Ocean Cargo Endorsement

■ Conagra additionally asserts that an Ocean Cargo Endorsement in effect at the time of its losses provides coverage for the losses. That endorsement "attach[s] upon all shipments of lawful goods and merchandise incidental to the business of the Insured shipped by or to the Insured for their account as principals or as agents for others[.]" (Joint App., Ex. 178 at A310513.) The Valuation clause, paragraph 9 of the endorsement, sets forth the means of evaluating "Storage at Non–Owned Stores (Excluding Transit Stores)" and "Inland Transits with no Ocean Voyage Involvement." (*Id.* at A310514–15.)

Conagra specifically directs the Court to paragraph 28 of the Ocean Cargo endorsement, titled "Voyage Clause," which provides in relevant part:

> The insurance hereunder attaches from the time the subject-matter becomes at the Assureds risk or the Assured as-

sumes interest and continues whilst the subject-matter is in transit and/or in store or elsewhere, including whilst held as stock (whether at warehouse, or elsewhere) whether or not in the course of transit and including any interest held for purposes of consolidation and until finally delivered to final destination as required. Including risks in Customs as required, and transhipment, craft and barge risks, when customary.

\* \* \* \* \* \*

The foregoing not to apply to interest stored in the Assured's own warehouses and/or premises to the extent that such interest is covered under the Assured's Non–Marine Policies.

(*Id.* at A310520.)

Conagra contends that fire losses are within the scope of the coverage provided by Ocean Cargo coverage and, despite the title of the endorsement, the insurance provided is not limited to losses incurred in the course of ocean voyages. (Conagra Mem. at 11.) Conagra asserts that coverage is available under the Ocean Cargo Endorsement in that: (1) the Marshall Facility and Americold Facility were non-owned warehouses serving as food product distribution centers; and (2) the final destination of the goods destroyed in the fires at the facilities was not reached. (*Id.* at 12.)

■ In response, Arkwright contends that careful consideration of paragraph 28 of the Ocean Cargo Endorsement, the balance of the Ocean Cargo Endorsement and the policy as a whole demonstrate that the endorsement unambiguously does not provide coverage for the Americold and Marshall losses because it only applies to ocean voyages. (Ark.Resp. at 5.) Arkwright notes that other provisions in the Ocean Cargo Endorsement unambiguously demonstrate that the endorsement contemplat-

ed coverage for ocean related voyages or connecting conveyance to an ocean related voyage, and, indeed, that paragraph 28 of the Ocean Cargo Endorsement relied upon by Conagra itself refers to "risks in Customs as required, and transhipment, craft and barge risks, when customary" (*id.*).[6]

The Court finds that, considered in isolation, the Ocean Cargo Endorsement would provide coverage for the Marshall and Americold losses. The coverage attached "upon all shipments of lawful goods and merchandise incidental to the business of the [Conagra]" at any place in the world (except Iraq) "from the time the subject-matter [became] at [Conagra's] risk" and "continued [while] the subject-matter [was] in transit and/or store or elsewhere, including [while] held as stock (whether at [a non-owned] warehouse, or elsewhere) whether or not in the course of transit[.]" (Joint App., Ex. 178 at A310513, A310520.) Moreover, the endorsement explicitly contemplated valuation for "Inland Transits with no Ocean Voyage Involvement." (*Id.* at A310515.) Arkwright does not dispute that the fires at issue occurred at non-owned outside warehouses and that the destroyed property was Conagra's food products that had left Conagra production facilities and were in temporary storage awaiting consolidation and delivery to Conagra's customers. As such, standing alone, the Ocean Cargo Endorsement would provide coverage for the losses at issue. *See Farr Man Coffee v. Chester,* No. 88 Civ. 1692(DNE), 1993 WL 248799, *39 (S.D.N.Y. May 28, 1993) (finding under same policy provision that "coverage attaches not upon transit, but when the insured is at risk for the [goods] . . . regardless of whether the goods are in storage or transit").

■ In interpreting the intent of the parties in construing an insurance con-

**6.** Arkwright further seeks that this Court draw an inference from the title of paragraph 28 of the endorsement—"Voyage Clause." But this Court will not draw any inference from this title because the Arkwright Policy states that "the title of the various paragraphs

of this form (and of endorsements attached to the Policy) are solely for reference and shall not in any way affect the provisions to which they relate." (Joint App., Ex. 175 at A310379.)

tract, however, the Court cannot rely solely on an isolated provision contained in a broad, comprehensive insurance program such as Conagra's. Instead, to ascertain the meaning of the policy's words and the intent of the parties, courts must construe the policy as a whole with due regard to the risk undertaken, the subject matter that is insured and the purposes of the entire contract. *Employers Ins. of Wausau,* 144 F.3d at 1104; *Outboard Marine,* 154 Ill.2d at 107–08, 180 Ill.Dec. 691, 607 N.E.2d at 1212. Undertaking such an inquiry, it is clear that an issue of fact exists as to whether the parties intended that the Americold and Marshall inventories would be covered under the Ocean Cargo Endorsement. As discussed in § II(A)(1) of this opinion, the Arkwright Policy contained separate property coverage policy provisions under which Arkwright and London insurers split responsibility for all of Conagra's property locations on the basis of their reported total insured value. Arkwright has presented considerable evidence that the parties did not intend the Americold and Marshall inventories to be covered under the Ocean Cargo Endorsement. (*See* Joint App., Ex. 24, 429:9–17; Ex. 13, 160:2–161:5, 184:10–15; Ex. 12, 367:1–9; Ex. 180, 94:14–95:14; Ex. 26, 269:14–18.) [7]

In sum, construing the policy as a whole with due regard to the risk undertaken, the subject matter of the insured and the purposes of the entire contract, the Court finds an issue of fact as to whether the Ocean Cargo Endorsement provides coverage for the Americold and Marshall losses.

### 3. Summary

In sum, in light of the factual issues discussed above, the Court denies Conagra's motion for summary judgment with respect to Count I of its Second Amended Complaint.

---

7. Arkwright additionally argues that adopting Conagra's interpretation of the policy language would render another policy provision,

### B. Estoppel (Count II)

Under Illinois law, an insurer is estopped from denying coverage where the insured can establish that: (1) he was misled by an act or statement of the insurer, (2) he reasonably relied on the conduct or representation, and (3) he was prejudiced thereby. *See Ankus v. Government Employees Ins. Co.,* 285 Ill.App.3d 819, 822, 221 Ill.Dec. 72, 674 N.E.2d 865, 868 (1st Dist.1996). *See also Allstate Ins. Co. v. Smiley,* 276 Ill.App.3d 971, 983–84, 213 Ill.Dec. 698, 659 N.E.2d 1345, 1355 (2d Dist.1995). The insured has the burden of establishing estoppel by "clear, concise, and unequivocal evidence." *Ankus,* 285 Ill.App.3d at 822, 221 Ill.Dec. 72, 674 N.E.2d at 868.

Here, Conagra has presented evidence that Arkwright made a promise to match certain coverage provided by Conagra's prior insurers (the London insurers), *i.e.,* make the coverage "as broad or broader." (Joint App., Ex. 7; Ex. 57; Ex. 12 at 123:19–124:11; Ex. 63; Ex. 110; Ex. 104; Ex. 105; Ex. 108.) Conagra has additionally presented evidence that Arkwright promised that the implementation of the joint program with London would not affect the scope of coverage. (*Id.,* Ex. 70.) Conagra's risk manager has further testified that he relied on this representation in selecting Arkwright to replace his existing insurance. (*Id.,* Ex. 12, 123:19–124:11; Ex. 181, 159:11–161:7.) Conagra has additionally presented expert testimony opining that the Americold and Marshall losses would have been covered by the London Insurers under Conagra's prior insurance program. (*Id.,* Ex. 155; Ex. 157.)

In response, Arkwright concedes that it represented to Conagra that the joint program with London would provide "as broad or broader coverage than the preexisting London coverage." (Arkwright Resp. at 25.) Nevertheless, Arkwright argues and presents evidence that Conagra

the Transportation Endorsement (*see* Joint App., Ex. 175 at A310503), meaningless.

understood that there were differences: (1) between the Arkwright Policy effectuated in June of 1989 and its prior policy with the London insurers (see Arkwright Resp. at 20–22 (citing Joint App., Ex. 13 at 65–66; Ex. 24 at 82–83)); and (2) between the joint Arkwright/London insurance program instituted in June of 1991 and the previous London policy (see id. at 22–24 (citing Joint App., Ex. 13 at 93–94; Ex. 21 at 341:13–21)).

Arkwright additionally asserts that any reliance by Conagra on its purported representations could not be considered reasonable. Arkwright asserts that because its joint insurance program with London involved separate insurers and separate insurance policies, it could not make the promises Conagra asserts were made. (Arkwright Resp. at 24–25.) Put another way, Arkwright asserts that it never promised that its policy, by itself, provided coverage "as broad or broader" than the prior London policy; instead, it stated that the totality of the joint coverage provided by it and London would be "as broad or broader" than the preceding London policy subject to agreed upon differences.

Although Conagra has presented considerable evidence that it relied on representations by Arkwright that its insurance coverage with Arkwright would be as broader or broader than coverage under its preceding coverage with the London insurers, Arkwright, as discussed above, has presented evidence that any reliance by Conagra on Arkwright's statements was unreasonable. Drawing the inferences from Arkwright's evidence in a light most favorable to it, as this Court must do in the context of summary judgment, the Court finds that the issue of whether Conagra has demonstrated that it reasonably relied on Arkwright's purported representations by "clear, concise, and unequivocal evidence" is for the trier of fact. Conagra's motion for summary judgment with respect to Count II is therefore denied.

### C. Unfair Practices (Count III)

In Count III of its Second Amended Complaint, Conagra alleges that Arkwright committed "unfair and deceptive acts and practices" within the meaning of Mass.Gen.L. ch. 93A, § 11 ("Chapter 93A") in responding to Conagra's claim for losses stemming from the warehouse fires. Specifically, Conagra alleges that Arkwright committed the following deceptive acts and practices:

(a) failing to acknowledge, timely consider, and clearly respond to the claim of Conagra for the Americold and Marshall losses;

(b) requiring Conagra to provide information concerning the losses already available to Arkwright and take steps concerning the losses already available to Arkwright and take steps concerning the losses not necessary or reasonable in an effort to delay or frustrate payment;

(c) wrongfully denying payment of the Americold and Marshall losses when coverage is reasonably clear:

(d) asserting insupportable positions with respect to coverage of losses of the type previously covered; and

(e) attempting to delay or frustrate payment of the Americold and Marshall losses in an attempt to force a contribution from the London Underwriters for its own benefit and to the detriment of Conagra, its insured.

(Sec.Am.Cmplt.¶ 49.)

Arkwright has moved for summary judgment on this claim, asserting that: (1) application of controlling choice of law rules demonstrates that Massachusetts law does not apply to this claim; and (2) even if Massachusetts law were to apply to this claim, the conduct that Conagra alleges was unfair and triggers Chapter 93A did not occur "primarily and substantially" in Massachusetts, as required by the terms of the statute.

The initial threshold question regarding this claim is whether the Massachusetts law, Chapter 93A, applies in this action. As a federal court located in Illinois, the parties agree that this Court must apply

Illinois choice of law principles to answer this question. *See Klaxon v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Illinois has somewhat different choice of law rules for tort and contract claims, and, not surprisingly, the parties disagree regarding the nature of Conagra's Section 93A claim.

■ For choice of law purposes, Chapter 93A claims can be treated either as contract or tort claims. *Compare Northeast Data Sys. Inc. v. McDonnell Douglas Computer Sys. Co.,* 986 F.2d 607 (1st Cir. 1993) (treating Chapter 93A claim as a contract claim for choice of law purposes) *with Crellin Techs., Inc. v. Equipmentlease Corp.,* 18 F.3d 1, 11 (1st Cir.1994) (treating Chapter 93A claim as a tort for choice of law purposes). The facts underlying the claim and the conduct complained of are the relevant factors in determining if the claim is most analogous to a tort or contract claim. *Crellin Techs.,* 18 F.3d at 12.

■ Here, upon considering the facts underlying Conagra's Section 93A claim and the conduct complained of, the Court finds that Conagra's claim more closely resembles a contract claim. There can be no disagreement that the breach of the insurance contract is an essential element of Conagra's Section 93A claim. Although, as Arkwright even admits, certain aspects of Conagra's Section 93A claim "arguably have tort characteristics" (*see* Arkwright Mem. at 11), the core of Conagra's claim is based on Arkwright's contractual responsibilities and how it allegedly mishandled those responsibilities. Under such circumstances, courts have found that a Section 93A claim amounts to breach of contract for choice of law purposes. *See Northeast Data Sys.,* 986 F.2d at 609–10; *Scully Signal Co. v. Joyal,* 881 F.Supp. 727, 742 (D.R.I.1995); *Worldwide Commodities, Inc. v. J. Amicone Co., Inc.,* 36 Mass.App. Ct. 304, 630 N.E.2d 615, 617–18 (1994).

This finding is consistent with Illinois court precedent which suggests that Illinois courts would characterize Conagra's Section 93A claim as a contract claim.

Specifically the Illinois Supreme Court has stated:

An insurer's conduct may give rise to both a breach of contract action and a separate and independent tort action. Mere allegations of bad faith or unreasonable and vexatious conduct, without more, however, do not constitute such a tort. Courts therefore should look beyond the legal theory asserted to the conduct forming the basis for the claim. In cases where a plaintiff actually alleges and proves the elements of a separate tort, a plaintiff may bring an independent tort action, such as common law fraud, for insurer misconduct.

*Cramer v. Insurance Exch. Agency,* 174 Ill.2d 513, 527, 221 Ill.Dec. 473, 675 N.E.2d 897, 904 (1996). *See also Hardin, Rodriguez & Boivin, Ltd. v. Paradigm Ins. Co.,* 962 F.2d 628, 638–39 (7th Cir.1992) (distinguishing contract claims from independent torts); *American Builders & Contractors Supply Co. v. Home Ins. Co.,* No. 96 C 5041, 1997 WL 43017, at *1 (N.D.Ill. Jan.28, 1997). Here, Conagra has not alleged the elements of a separate independent tort as contemplated by the Illinois Supreme Court.

It bears noting that this finding is also consistent with the Massachusetts state court's interpretation of Conagra's specific claim. In a preliminary ruling in this case, the Superior Court of Massachusetts stated that "Arkwright's potential liability under [Section 93A] jackets what is essentially a claim for breach of contract." *Conagra, Inc. v. Arkwright Mut. Ins. Co.,* No. 93–0535–C, 1995 WL 808941, at *7 (Mass.Super.Ct. Mar. 14, 1995). In sum, in light of the above factors and circumstances, this Court determines that Conagra's Section 93A claim should be considered an action for breach of contract for choice of law purposes.

■ In dealing with choice-of-law issues in the area of contract law, the Illinois Supreme Court applies a "most significant contacts" test. *See West Suburban Bank of Darien v. Badger Mut. Ins. Co.,* 141

F.3d 720, 724 (7th Cir.1998). Here, Arkwright has convincingly demonstrated, and Conagra does not offer any contrary argument, that Massachusetts law cannot apply to a breach of contract claim under the most significant contracts analysis. (*See* Arkwright Mem. at 6–11.) Because Massachusetts law does not apply to Conagra's unfair practices claim, the Court grants summary judgment in Arkwright's favor on Count III of Conagra's Complaint.[8]

### D. Breach of Contract (Count IX)

■ In Count IX of its Second Amended Complaint, Conagra asserts a breach of contract claim against Arkwright. In summary, Conagra alleges that Arkwright represented that any savings obtained by Arkwright with respect to costs associated with reinsurance would be credited to the premium otherwise payable to Conagra and that, despite actual knowledge by Arkwright that its costs for reinsurance had decreased, Arkwright undertook to hide such information from Conagra and further failed to credit Conagra for or refund Conagra amounts between 1990 and 1991, approximated to be at least $500,000. (Sec.Am.Cmplt.¶¶ 73–75.)[9] Arkwright moves for summary judgment on this count, asserting that the undisputed facts demonstrate that the decrease in the cost of reinsurance was passed on to Conagra.

It is undisputed that reinsurance was negotiated on an annual basis by Arkwright and that it was Arkwright's normal mode of business to pass on savings in the cost of reinsurance to its customers. (*See* Conagra 12(N) Resp. ¶¶ 62, 63.) In support of its motion for summary judgment, Arkwright submits an affidavit by an individual with supervisory responsibility for the procurement of reinsurance asserting that Arkwright's decrease in reinsurance costs were passed on Conagra. (*See* 2/9/99 Hall Aff.) Arkwright additionally submits testimony by an expert witness who stated that the only way to legally pass on reinsurance savings to a policyholder on renewal is by reducing the premium charge to the policyholder and that Arkwright did so based on "everything [he had] seen." (*See* Arkwright 12(M) ¶ 63.)[10]

Conagra essentially presents two facts in support of denying Arkwright's motion. First, Conagra directs the Court's attention to a document prepared by an Arkwright account service representative involved with the Conagra account. In this document, the account representative stated that Conagra's reinsurance costs in 1991–92 had decreased from 1990–91 and that this would "present a problem in explaining why the reinsurance had dropped, but the savings had not been passed on to Conagra, which is something we told them we would be doing." (Joint App., Ex. 142.) The account representative additionally stated that Arkwright should make recommendations to Conagra concerning upgrading particular risks "even if it is totally impractical" in an effort to "get [Conagra] to concentrate on [those]

---

**8.** Because the Court finds that Massachusetts law does not apply to Conagra's unfair practices claim, the Court need not consider Arkwright's alternative argument that the actions and transactions complained of by Conagra did not occur primarily and substantially within Massachusetts as required by Chapter 93A.

**9.** Reinsurance is "the ceding by one insurance company to another of all or a portion of its risks for a stipulated portion of the premium, in which the liability of the reinsurer is solely to the reinsured, which is the ceding company, and in which contract the ceding company retains all contact with the original insured, and handles all matters prior to and

subsequent to loss." *National Union Fire Ins. Co. of Pittsburgh, Pa. v. Continental Illinois Corp.*, Nos. 85 C 7080, 85 C 7081, 1987 WL 11353, at *4–5 (N.D.Ill. May 29, 1987) (quoting 13A APPLEMAN, INSURANCE LAW AND PRACTICE § 7681, at 480 (1976)).

**10.** It is undisputed that the premium Conagra paid to Arkwright was less per $100 of insured value in 1991 than it was in 1990; however, Conagra asserts that there were additional differences between its 1990 and 1991 insurance program with Arkwright which could have led to the difference in the premium price. (*See* Conagra 12(N) Resp. ¶ 65).

changes rather than the reinsurance issue." (*Id.*)

Conagra argues that the "clear implication" of this document is that Arkwright knew that it had to pass on to Conagra its saved reinsurance costs, chose not to do so and constructed a "distraction issue" to divert Conagra's attention from that matter. (Conagra Resp. at 18.) The force of this evidence is significantly lessened, however, by the fact that it is undisputed that the account representative—whom Conagra described elsewhere as a "clerical person" (*see* Conagra Mem. at 16)—was not involved in the procuring of reinsurance and did not understand how it was structured for the Conagra account. (*See* Conagra 12(N) Resp. ¶ 61.)

Conagra additionally proffers testimony by an expert. Conagra's expert asserts that the assertion by Arkwright's expert that reinsurance costs were passed on to Conagra is flawed because he did not conduct the proper analysis, namely "conduct[ing] a very thorough analysis of Arkwright's actual reinsurance costs by type of reinsurance purchased for specific locations and classes of risk over multiple policy years" and "evaluat[ing] the rating of all lines of coverage to determine whether or not any rate reductions were granted based on the merits of the risks involved or on actual reinsurance savings actually passed on to Conagra." (Joint App., Ex. 158 at 3.) Notably, however, Conagra's expert has not conducted this "thorough analysis" himself. Instead, Conagra merely contends that Arkwright should have conducted such a calculation and that Arkwright's "failure to present proper evidence to document payment of [reinsurance] savings to Conagra should give rise to adverse inferences against Arkwright." (Conagra Resp. at 19–20.)

As discussed previously, the party opposing a summary judgment motion bears an affirmative burden of presenting evidence that a disputed issue of material fact exists. *See Matsushita Elec.*, 475 U.S. at 586–87, 106 S.Ct. 1348. This burden cannot be met with conclusory statements or speculation. *See Aberman v. J. Abouchar & Sons, Inc.*, 160 F.3d 1148, 1150 (7th Cir.1998). Here, Conagra has not presented sufficient evidence demonstrating that a disputed issue of material fact exists regarding Count IX. The only affirmative evidence that Conagra has presented in response to Arkwright's motion is the document prepared by Arkwright's account representative. This document has minimal value in light of the fact that the account representative was not involved in the procuring of reinsurance and did not understand how it was structured for the Conagra account. Stripped of this document, Conagra's response to Arkwright's evidence that it passed the reinsurance savings on to Conagra is based on conclusory allegations that Arkwright's expert did not perform a proper analysis in constructing his opinion. However, "in the absence of supporting evidence 'conclusory allegations by the party opposing a summary judgment motion cannot defeat the motion.'" *Aberman*, 160 F.3d at 1150 (quoting *Smith v. Shawnee Library Sys.*, 60 F.3d 317, 320 (7th Cir.1995)). Arkwright's motion for summary judgment on Count IX of Conagra's Second Amended Complaint is therefore granted.

### III. *Conagra v. Hobbs*

In its Second Amended Complaint, Conagra asserts that Hobbs acted as an "insurance broker" in that it procured insurance and acted as a middleman between Conagra and its insurers. Conagra asserts three claims against Hobbs: (1) breach of fiduciary duty (Count V), (2) negligent misrepresentation (Count VI) and (3) breach of contract (Count VII). Conagra and Hobbs have filed cross-motions for summary judgment concerning all three counts. Hobbs additionally moves for summary judgment to limit damages, asserting that even if it is liable to Conagra, it is entitled to a credit for amounts Conagra received from third party tortfeasors responsible for the Americold Loss and the Marshall Loss and for amounts Conagra received from the London insur-

ers pursuant to the written agreement between them.[11]

### A. Was Hobbs Conagra's Broker?

■ The threshold question regarding Conagra's claims against Hobbs is whether, or to what extent, Hobbs served as Conagra's broker. The Illinois Supreme Court distinguishes between insurance agents and brokers. In particular, the court has stated:

A broker is an individual who procures insurance and acts as a middleman between the insured and the insurer, who solicits insurance business from the public under no employment from any special company and who, having secured an order, places the insurance with the company selected by the insured, or in the absence of any selection by the insured, with the company he selects himself. An agent is an individual who has a fixed and permanent relation to the companies he represents and who has certain duties and allegiances to such companies.

*Zannini v. Reliance Ins. Co. of Illinois, Inc.,* 147 Ill.2d 437, 451, 168 Ill.Dec. 820, 590 N.E.2d 457, 462–63 (1992) (quoting *Krause v. Pekin Life Ins. Co.,* 194 Ill. App.3d 798, 804–05, 141 Ill.Dec. 402, 551 N.E.2d 395, 399 (1st Dist.1990)). *See also Lazzara v. Howard A. Esser, Inc.,* 802 F.2d 260, 264 (7th Cir.1986). The determination of whether a person is acting an agent or a broker governs to whom he may owe a duty. *Zannini,* 147 Ill.2d at 451, 168 Ill.Dec. 820, 590 N.E.2d at 462–63.

■ A company's conduct during a transaction, not its title, determines whether it is an agent or a broker. *See id.,* at 452–53, 168 Ill.Dec. 820, 590 N.E.2d at 463. Therefore, to determine whether an intermediary is an agent or a broker, Illinois courts consider: (1) who first set the company in motion, (2) who could control the company's action, (3) who was to pay it, and (4) whose interest it was there to protect. *See Brandt v. Time Ins. Co.,* 302 Ill.App.3d 159, 166, 235 Ill.Dec. 270, 704

N.E.2d 843, 848 (1st Dist.1998). *See also Lazzara,* 802 F.2d at 264–65. Whether a company is acting as an agent for the insured or the insurer is generally a question of fact, and "only when the evidence clearly shows the person is the agent of the insured does the issue become one of law." *Brandt,* 302 Ill.App.3d at 166, 235 Ill.Dec. 270, 704 N.E.2d at 848. *See also Duignan v. Lincoln Towers Ins. Agency, Inc.,* 282 Ill.App.3d 262, 268, 217 Ill.Dec. 519, 667 N.E.2d 608, 612 (1st Dist.1996).

■ Here, Hobbs concedes that it was a broker for Conagra with respect to the placement of a "portion" of Conagra's insurance, but not for Conagra's entire property insurance program. (*See* Hobbs Reply at 9; *see also* Joint App., Ex. 3 ¶ 2–3.) Particularly, Hobbs acknowledges that it served as Conagra's broker for placement of the excess portion of Conagra's property insurance program but did not serve as Conagra's broker with respect to placement of insurance with Arkwright or with the London market. (*See* Hobbs Reply at 2–3.) As such, Hobbs asserts that it did not have any duties to Conagra regarding the handling of Conagra's insurance needs other than pertaining to the excess insurance.

In support of its argument, Hobbs relies on a Broker of Record letter dated January 25, 1991 sent from Conagra's vice president in charge of insurance and loss control to Arkwright. (*See* Joint App., Ex. 69.) In this letter, Conagra requested that Arkwright prepare a proposal for property insurance. The letter additionally stated:

To facilitate the quotation of this new property program, Conagra hereby assigns sole broker of record for Lloyds and British Companies to Lloyd Thompson Limited[.] Conagra hereby assigns sole broker of record for all other markets to Hobbs Group, Inc.

(*Id.*) Hobbs contends that this Broker of Record letter did not appoint any entity as the broker for the Arkwright portion of

---

**11.** The parties agree that Illinois law applies to their dispute.

Conagra's insurance. (*See* Hobbs Reply at 8.) Hobbs states that that is so because, as Conagra admits, Arkwright is a direct writer of insurance and sells its insurance products without the intermediary of insurance agents or brokers. (*See* Conagra 12(N) Resp. ¶¶ 7–8.) Hobbs additionally asserts that it was not the broker for the insurance placed with the London market. First, Hobbs notes that the Broker of Record letter appointed Lloyd Thompson as sole broker of record for the London market. Hobbs additionally has presented evidence that Arkwright—not Hobbs—directed and controlled the communications with London insurers on Conagra's behalf. (*Id.*, Ex. 89; Ex. 12 at 623–24, 638–39; Ex. 21 at 448–49; Ex. 49.) In sum, Hobbs contends that the evidence demonstrates that it was Arkwright, not Hobbs, who was acting as Conagra's broker for placement of the London and, indeed, the entire combined property insurance program.

Conagra paints a very different picture. On its end, Conagra has submitted considerable evidence that Hobbs served as its broker in all capacities regarding its property insurance. Specifically, Conagra tenders evidence that: (1) Hobbs' marketing manager responsible for the Conagra account testified that "Hobbs was the U.S. broker of record for the London placement and the broker of record for the domestic placements" (*id.*, Ex. 20 at 27–28); (2) the lead underwriter for the London market testified "I believe that Hobbs Group acted as the broker for Conagra, the American broker" (*id.*, Ex. 18 at 147); (3) the head underwriter for Arkwright testified that "Hobbs Group was the broker of record for Conagra in the representation to the London marketplace" (*id.*, Ex. 13 at 239); and (4) the head of Hobbs' Midwest regional office stated in a June 10, 1992 letter to Conagra: "As you know, Hobbs Groups, Inc. was the broker of record for Conagra in the placement of the insurance coverage for products of Conagra's ...

that were damaged in that fire," (*id.*, Ex. 166).

Conagra has provided evidence that Hobbs made contact with the London and domestic insurance markets on Conagra's behalf. (*Id.*, Ex. 20, 28–28, 30–32, 35–39; *see also* Conagra Mem. at 9.) Moreover, Conagra asserts that the January 25, 1991 Broker of Letter discussed above supports *its* position because it designated Hobbs as broker of record "for all other markets" (Joint App., Ex. 69)—a phrase which it interprets to mean as its United States broker. (*See* Conagra Reply at 2.)

As noted earlier, whether a company is acting as an agent for the insured or the insurer is generally a question of fact, and "only when the evidence clearly shows the person is the agent of the insured does the issue become one of law." *Brandt*, 302 Ill.App.3d at 166, 235 Ill.Dec. 270, 704 N.E.2d at 848. It is undisputed that Hobbs served as Conagra's broker in some capacity; however, the parties have presented conflicting evidence regarding whether Hobbs served as Conagra's broker with respect to, the Arkwright and London property insurance program. The weight of the evidence favors Conagra's argument, but, drawing the inferences in Hobbs' favor, *see Wilson v. Chrysler Corp.*, 172 F.3d 500, 511 (7th Cir.1999), it cannot be said that the evidence "clearly" demonstrates the extent to which Hobbs served as Conagra's broker as a matter of law.[12] As such, the Court finds that the extent to which Hobbs served as a broker for Conagra's property insurance program is an issue of fact for the trier of fact.

### B. Merits of Conagra's Claims Against Hobbs

#### 1. Breach of Fiduciary Duty (Count V)

Both parties have moved for summary judgment on Conagra's breach of fiduciary duty claim. Hobbs asserts that Conagra's breach of fiduciary duty claim must fail because it had no fiduciary

---

**12.** Indeed, Conagra acknowledges that Hobbs structured Conagra's insurance program to suit Arkwright and "did what it was told by Arkwright," at least with respect to part of the Conagra's insurance placement. (Conagra Mem. 14–16.)

relationship with Conagra. The relationship between an insured and its broker, acting as the insured's agent, is a fiduciary one. *See Kanter v. Deitelbaum*, 271 Ill. App.3d 750, 753, 208 Ill.Dec. 215, 648 N.E.2d 1137, 1139 (1st Dist.1995). *See also Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*, No. 91 C 6103, 1994 WL 687579, at *13 (N.D.Ill.Dec.7, 1994). The Illinois Appellate Court has stated:

> [A]n insurance broker is bound to exercise reasonable skill and diligence in the transaction of the business entrusted to him and will be responsible to his principal for any loss resulting from his failure to do so. However, a broker is not liable if he acts in good faith and with reasonable care, skill, and diligence to place the insurance in compliance with his principal's instructions. Moreover, a broker's employment in each case is that of a special agent for a single objective. Once the limited purpose of the broker's agency is accomplished, the broker no longer owes an ongoing fiduciary duty to the ex-principal.

*See Faulkner v. Gilmore*, 251 Ill.App.3d 34, 37, 190 Ill.Dec. 455, 621 N.E.2d 908, 911 (3d Dist.1993).

As noted above, the scope of Hobbs' broker duties constitutes an issue of fact which precludes a finding of summary judgment on behalf of either party. Moreover, in the event that the trier of fact would find that Hobbs possessed a fiduciary duty to Conagra, Conagra has presented more than sufficient evidence that Hobbs failed to exercise reasonable skill and diligence in the transaction of Conagra's business and that those actions proximately caused Conagra damages to withstand summary judgment. (*See* Conagra Mem. at 10–21 and supporting evidence.)

As such, the cross-motions for summary judgment on the breach of fiduciary claim are denied.

### 2. Negligent Misrepresentation (Count VI)

Both parties have moved for summary judgment on Conagra's negligent misrepresentation claim. In order to survive summary judgment on a claim for negligent misrepresentation, a plaintiff must sufficient evidence that: (1) the defendant owed a duty owed to the plaintiff to communicate accurate information, (2) the defendant made a false statement of material fact, (3) the defendant was careless or negligent in ascertaining the truth of the statement, (4) the defendant intended to induce action by the plaintiff, (5) the plaintiff acted in reliance upon the truth of the defendant's statement, and (6) plaintiff was damaged as a result of its reliance. *See Board of Ed. v. A., C. & S., Inc.*, 131 Ill.2d 428, 452, 137 Ill.Dec. 635, 546 N.E.2d 580, 591 (1989). *See also Orix Credit Alliance, Inc. v. Taylor Mach. Works, Inc.*, 125 F.3d 468, 475 n. 2 (7th Cir.1997).

Hobbs initially contends that it had no duty to Conagra to communicate accurate information. Again, this issue is intertwined with whether Hobbs served as Conagra's broker and is inappropriate for summary judgment.[13]

Hobbs additionally argues that even if it had a duty to communicate accurate information, Conagra has not pointed to any particular false statements of material fact Hobbs made to it or that Hobbs relied on any such statement. (Hobbs Reply at 17.) The Court agrees. Instead of submitting evidence of false statements by Hobbs, Conagra asserts that "although Hobbs purported to be Conagra's broker,

---

**13.** Under Illinois law, tort claims involving purely economic loss such as negligent misrepresentation are generally barred unless the plaintiff establishes an applicable exception. Hobbs asserts that the most logical exception—a claim against someone who is in the business of supplying information for the guidance of others in their business transactions—does not apply here and, therefore,

Conagra's negligent misrepresentation claim fails. The Court cannot grant summary judgment on this ground because, assuming Hobbs served as its broker (which is an issue of fact), it was in the business of supplying information. *See, e.g., Kanter*, 271 Ill.App.3d at 754–55, 208 Ill.Dec. 215, 648 N.E.2d at 1140. *See also Allendale Mut. Ins.*, 1994 WL 687579, at *15.

it did not inform Conagra that it was not really protecting Conagra's interest" and "did not inform Conagra that Hobbs was deferring to Arkwright and delegating to Arkwright responsibilities typically performed by a broker." (Conagra Resp. at 9.) Conagra further asserts that "[i]f Hobbs was not acting as the fiduciary of Conagra, Hobbs had a duty to advise Conagra that it was not protecting Conagra's interests." (*Id.*)

Conagra's argument does not support a claim of negligent misrepresentation. Assuming that Hobbs was Conagra's broker, Conagra has simply presented no evidence of a false statement made by Hobbs and relied upon by Conagra. Moreover, assuming that Hobbs was not Conagra's broker, Conagra fails to cite any authority for the proposition that Hobbs would have a duty to communicate accurate information to Conagra. In sum, Conagra has not provided sufficient evidence from which a reasonable jury could find in favor of it on its negligent misrepresentation claim. Hobbs' motion for summary judgment on this count is, therefore, granted.

### 3. Breach of Contract (Count VII)

Conagra has additionally asserted a claim for breach contract against Hobbs. Conagra asserts that Hobbs orally agreed to obtain insurance on behalf of Conagra in accordance with Conagra's direction and instruction and breached that agreement. (Joint App., Ex. 1 ¶¶ 69–70.) Both parties have moved for summary judgment on this claim.

In its motion for the summary judgment, Hobbs asserts that there is no evidence of a meeting of the minds between Conagra and Hobbs regarding the placement of insurance. In response, Conagra argues that Hobbs entered into a contract to procure insurance by "implication." (Conagra Resp. at 13.) Particularly, Conagra argues that "Hobbs' conduct and the fact that it charged a fee for its services [ ] resulted in a contract to procure insurance." (*Id.* at 12.)

Although Conagra characterizes its claim as one for breach of an "oral" contract, its claim is more appropriately characterized as a breach of implied contract. Illinois law recognizes that parties may form contracts on an express written contract, an express oral contract, or an implied contract. *See, e.g., Owen Wagener & Co. v. U.S. Bank*, 297 Ill.App.3d 1045, 1050, 232 Ill.Dec. 160, 697 N.E.2d 902, 906 (1st Dist.1998). As discussed in the context of whether Hobbs served as Conagra's broker, there is appreciable evidence that Hobbs understood that it had an obligation to procure insurance for Conagra and to participate in structuring and implementing Conagra's property insurance program. Here, the issue of whether Conagra entered into such an arrangement is intermeshed with the determination of whether, or the extent to which, Hobbs served as a broker for Conagra, and this issue is, as discussed previously, for the trier of fact. The cross-motions for summary judgment are therefore denied as to this claim.[14]

### C. Hobbs' Motion for Partial Summary Judgment to Reduce Damages

Hobbs has additionally moved for partial summary judgment to reduce any damages it incurs, asserting that Conagra has received compensation for its alleged fire losses sustained at the Americold and Marshall warehouses. (Hobbs Mot. at 6.)[15] In response, Conagra asserts that

---

**14.** Hobbs' argument that it cannot be bound by any alleged agreement with Conagra because it was acting as an agent for Arkwright, a disclosed principal (*see* Hobbs Mem. at 28–29), cannot support summary judgment for the same reason, *i.e.*, this determination is again entwined with the issue of whether Hobbs was serving as Conagra's broker or an agent of Arkwright.

**15.** Hobbs contends that Conagra recovered damages regarding the Americold and Marshall warehouse losses from the individuals who caused the fires and in settlement with London insurers and excess insurers.

those payments were "in the nature of a loan receipt, subject to repayment and not payment of the Americold Loss and Marshall Loss." (Conagra Resp. at 2.)

 It is axiomatic that "[t]he purpose of awarding compensatory damages is to make the injured party whole and restore him to the position he was in before the loss, but not to enable him to make a profit or windfall on the transaction." *Harris v. Peters*, 274 Ill.App.3d 206, 207, 210 Ill.Dec. 812, 653 N.E.2d 1274, 1275 (1st Dist.1995) (citations omitted). Thus, Conagra is clearly not entitled to payments by Arkwright or Hobbs which would result in double recovery. Nevertheless, a determination of whether damage payments by Arkwright or Hobbs would result in such a windfall need not be conclusively determined now in light of the fact that neither Arkwright nor Hobbs have yet been found liable to pay damages to Conagra. As such, the Court denies Hobbs' motion without prejudice to reassert it in the event it is found liable to pay damages to Conagra.

## *CONCLUSION*

For the reasons set forth above, the Court: (1) denies Conagra's motion for summary judgment against Arkwright, (2) denies Conagra's motion for summary judgment against Hobbs, (3) grants Arkwright's motion for partial summary judgment with respect to Counts III and IX, (4) grants Hobbs' motion for summary judgment against Conagra with respect to Count VI and denies the motion with respect to Counts V and VII, and (5) denies Hobbs' motion for summary judgment for partial summary judgment to reduce damages.